*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LEONORA GJERGJI,

        Plaintiff-Appellee,

v

BERTI GJERGJI,

        Defendant-Appellant.

UNPUBLISHED
December 21, 2023

No. 366459
Oakland Circuit Court
Family Division
LC No. 2022-512803-DM

Before: JANSEN, P.J., and CAVANAGH and GADOLA, JJ.

PER CURIAM.

Defendant appeals as of right the judgment of divorce, which awarded plaintiff sole legal and physical custody of the parties' two minor children, SG and VG, and ordered defendant to pay $1,436 in monthly child support in accordance with the Michigan Child Support Formula. We affirm.

## I. FACTUAL BACKGROUND

In April 2022, plaintiff filed a verified complaint for divorce contending (1) the parties were married on October 12, 2014, in Troy, Michigan, (2) the parties ceased to live as husband and wife on April 14, 2022, due to ongoing physical abuse and verbal abuse by defendant, (3) SG and VG currently resided with plaintiff, and plaintiff was the primary caretaker for the minor children since their birth, and (4) sole legal and physical custody of SG and VG should be awarded to plaintiff. Plaintiff additionally filed an ex parte motion for interim sole custody, parenting time, and child support. In her motion, plaintiff advanced (1) defendant failed to adequately participate in the minor children's lives, (2) defendant perpetuated domestic violence against plaintiff in the presence of SG and VG, which included one incident in 2017 when defendant assaulted plaintiff while she was holding 6-month-old SG resulting in defendant's conviction of being a disorderly person, (3) plaintiff decided to file for divorce following an episode on April 11, 2022, during which the family was on a trip in Traverse City, Michigan, and defendant yelled at, spit on, and threw a pillow at plaintiff, which scared the minor children, and (4) defendant posed a risk to the wellbeing of SG and VG, and plaintiff was fit and competent to maintain sole interim custody of the minor children.

In May 2022 defendant filed a counterclaim for divorce, contending joint legal custody and equal parenting time were in the minor children's best interests, and there was a breakdown

-1-

of the marital relationship of the parties. Defendant also filed an answer to plaintiff's complaint for divorce, generally denying the domestic violence allegations, and advancing (1) plaintiff initiated arguments with defendant, and plaintiff punched, screamed at, and spat on defendant, (2) plaintiff remained with the family following the Traverse City incident until the parties returned to their primary residence, then left with the minor children, and (3) joint legal and physical custody of the minor children was in the best interests of SG and VG.

The court held a two-day bench trial and issued its judgment of divorce, opinion and order, and uniform child support order. The trial court granted plaintiff legal and physical custody of SG and VG, supervised parenting time for defendant through Impact Counseling Services contingent upon defendant's mandatory participation with a licensed psychologist, social worker, or counselor, and child support in the amount of $1,436 per month, with defendant's gross income listed at $72,000 and plaintiff's income listed at zero. With regard to child custody, the court first determined that an established custodial environment existed with plaintiff because plaintiff was the minor children's primary caregiver, and defendant failed to communicate with or visit SG and VG since June 2022. Per the best-interests factors under MCL 722.23, the trial court determined that all of the applicable factors overwhelmingly favored plaintiff, and concluded by clear and convincing evidence that it was not in SG's and VG's best interests to change the established custodial environment with plaintiff. Concerning child support, the trial court determined it would not impute income to unemployed plaintiff; however, it determined defendant's annual gross income to be $72,000, and imposed defendant's child support obligation accordingly. Defendant appeals.

## II. CHILD SUPPORT

Defendant argues that the trial court erred when it calculated defendant's child support obligation because it incorrectly determined defendant's gross income was $72,000, which was contrary to defendant's income tax filings and the evidentiary record. We disagree.

Child support orders are reviewed for an abuse of discretion. *Clarke v Clarke*, 297 Mich App 172, 178-179; 823 NW2d 318 (2012). "An abuse of discretion occurs when a court selects an outcome that is not within the range of reasonable and principled outcomes." *Carlson v Carlson*, 293 Mich App 203, 205; 809 NW2d 612 (2011) (citation omitted). Whether the trial court properly applied the Michigan Child Support Formula (MCSF) is a question of law that we review de novo. *Clarke*, 297 Mich App at 179. The trial court's factual findings, including those regarding the calculation of income available for support, are reviewed for clear error. *Id.* "A finding is clearly erroneous if this Court, on all the evidence, is left with a definite and firm conviction that a mistake was made; the appellant bears the burden of showing that a mistake was made." *Stallworth v Stallworth*, 275 Mich App 282, 284; 738 NW2d 264 (2007).

"The Michigan Legislature has required that when a court orders child support as part of a divorce judgment, 'the court shall order child support in an amount determined by application of the child support formula developed by the state friend of the court bureau' unless to do so would be 'unjust or inappropriate' and the trial court makes certain specified findings 'in writing or on the record . . . .' " *Stallworth*, 275 Mich App at 283-284, quoting MCL 552.605(2). "[T]he first step in determining a child-support award is to ascertain each parent's net income by considering all sources of income." *Stallworth*, 275 Mich App at 284; 2021 MCSF 2. The term "net income" is defined as "all income minus deductions and adjustments permitted by this manual." 2021 MCSF 2.01(A). Income is broadly defined to include wages and "[e]arnings generated from a business, partnership, contract, [or] self-

employment." 2021 MCSF 2.01(C)(1)-(2). "Where income varies considerably year-to-year due to the nature of the parent's work, use three years' information to determine that parent's income." 2021 MCSF 2.02(B).

During the bench trial proceedings, defendant testified that he was employed as a car salesman at a family business called the House of Cars, and defendant was paid in cash based on sales. Defendant reported that, while the $1,000 weekly wage figure was previously a true representation of his income, business has since stalled. However, defendant further predicted that he would return to earning approximately $1,000 per week. Defendant deposits some, but not all, the cash he receives into the parties' joint bank account. Per an admitted bank statement detailing transactions between August 19, 2022 and September 21, 2022, defendant deposited $4,171 into the joint bank account. Between September 2022 and October 2022, defendant deposited an additional $6,130, and between December 2021 and February 2023, defendant deposited between $3,400 and $6,000 on a monthly basis. Defendant further stated that his 2021 joint income tax return listed his adjusted gross income as $43,238.

Plaintiff testified regarding the financial status of the parties that she shared a joint bank account with defendant, with defendant depositing at least $1,000 per week, primarily to pay off their two credit cards. Plaintiff further expressed that since filing the divorce defendant consistently fulfilled his child support obligations of $500 per month. However, plaintiff believed this amount was insufficient. Following the presentation of the parties' testimony, bank records, and tax statements, the trial court made the following findings in its opinion and order after trial:

> Defendant-Father's trial testimony regarding his income was vague and confusing. Defendant-Father testified that he is paid "cash" and deposits some, but not all, the cash he receives into the parties' joint account. Plaintiff-Mother encourages the Court to estimate Defendant-Father's income to be $72,000 per year ($6,000 monthly) based on evidence regarding deposits into the joint bank account and his testimony that he does not deposit all his income into the joint account. The Court agrees and holds that child support shall be calculated with Defendant-Father's income at $72,000 and Plaintiff-Mother's income at $0.00.

The court's determination regarding the appropriate figure concerning defendant's income is supported by the various financial documents admitted during the instant proceedings, in addition to the parties' testimony, which established defendant's true earnings were not entirely reflected in the cash deposits in the parties' joint accounts, which ranged from $3,400 to $6,000 on a monthly basis. See *Stallworth*, 275 Mich App at 286 (providing the trial court reasonably deduced that the defendant derived additional income that he did not report per the plaintiff's testimony regarding the defendant's cash earnings, which factored into the court's child support calculation). While defendant advances he filed a motion contesting the child support calculations to inform the court he was unable to afford the child support payments due to expenses related to providing care for his father, who suffered from cancer, neither the defendant's motion nor any other filing in the lower court featured any discussion regarding medical fees associated with defendant's father.

Defendant further advances the trial court judge exhibited inappropriate behavior when she listed false statements in the judgment of divorce, particularly with regard to defendant's income. Addressing defendant's misconduct allegations directed at the trial court, defendant fails to detail exactly what purported inappropriate behavior occurred, and the evidentiary

record does not demonstrate the trial court exhibited bias, incorrectly enumerated the underlying facts, or erroneously applied the law throughout the proceedings. Consequently, defendant's claim is meritless. The trial court did not err, or otherwise act inappropriately, when it calculated defendant's child support obligation because the evidentiary record, which included the parties' joint bank statements and the parties' testimony, demonstrated that defendant earned approximately $6,000 per month, which amounted to $72,000 in yearly wages. Furthermore, the court calculated defendant's child support obligation in accordance with the MCSF and MCL 552.605.

### III. CHILD CUSTODY

Defendant argues that the trial court erred when it determined it was in the minor children's best interests to award plaintiff sole legal and physical custody because it made findings against the great weight of the evidence. We disagree.

> In matters involving child custody, all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue. This Court will not interfere with the trial court's factual findings unless the facts clearly preponderate in the opposite direction. Discretionary rulings, including a trial court's decision to change custody, are reviewed for an abuse of discretion. In child custody cases specifically, an abuse of discretion retains the historic standard under which the trial court's decision must be palpably and grossly violative of fact and logic. Clear legal error occurs when the trial court incorrectly chooses, interprets, or applies the law. This Court reviews the trial court's determination regarding a child's best interests for clear error. This Court gives deference to the trial court's factual judgments and special deference to the trial court's credibility assessments. [*Brown v Brown*, 332 Mich App 1, 8-9; 955 NW2d 515 (2020) (quotation marks and citations omitted).]

In Michigan, the Child Custody Act of 1970, MCL 722.21 *et seq.*, governs the issue of child custody. Pursuant to MCL 722.26a(1), in custody disputes the parents shall be advised of joint custody and "[a]t the request of either parent, the court shall consider an award of joint custody, and shall state on the record the reasons for granting or denying a request." "Joint custody" means an order of the court in which one or both of the following is specified:

> (a) That the child shall reside alternately for specific periods with each of the parents.

> (b) That the parents shall share decision-making authority as to the important decisions affecting the welfare of the child. [MCL 722.26a(7).]

When a trial court examines a request for joint custody, it

> . . . shall determine whether joint custody is in the best interest of the child by considering the following factors:

> (a) The factors enumerated in [MCL 722.23].

(b) Whether the parents will be able to cooperate and generally agree concerning important decisions affecting the welfare of the child. [MCL 722.26a(1).]

"[T]he family court must consider all the factors delineated in MCL 722.23 and explicitly state its findings and conclusions with respect to each of them." *McRoberts v Ferguson*, 322 Mich App 125, 134; 910 NW2d 721 (2017) (citation omitted). The " 'best interests of the child' means the sum total of the following factors to be considered, evaluated, and determined by the court:"

(a) The love, affection, and other emotional ties existing between the parties involved and the child.

(b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any.

(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

(e) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(f) The moral fitness of the parties involved.

(g) The mental and physical health of the parties involved.

(h) The home, school, and community record of the child.

(i) The reasonable preference of the child, if the court considers the child to be of sufficient age to express preference.

(j) The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents. A court may not consider negatively for the purposes of this factor any reasonable action taken by a parent to protect a child or that parent from sexual assault or domestic violence by the child's other parent.

(k) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.

(*l*) Any other factor considered by the court to be relevant to a particular child custody dispute. [*Bofysil v Bofysil*, 332 Mich App 232, 244-245; 956 NW2d 544 (2020), quoting MCL 722.23.]

"The trial court need not necessarily engage in elaborate or ornate discussion because brief, definite, and pertinent findings and conclusions regarding the contested matters are

sufficient." *Foskett v Foskett*, 247 Mich App 1, 12; 634 NW2d 363 (2001). Furthermore, regarding MCL 722.26a(1)(b), this Court has provided:

> In order for joint custody to work, parents must be able to agree with each other on basic issues in child rearing—including health care, religion, education, day to day decision-making and discipline—and they must be willing to cooperate with each other in joint decision-making. If two equally capable parents whose marriage relationship has irreconcilably broken down are unable to cooperate and to agree generally concerning important decisions affecting the welfare of their children, the court has no alternative but to determine which parent shall have sole custody of the children. [*Bofysil*, 332 Mich App at 249 (quotation marks and citation omitted).]

The trial court, in its opinion and order, evaluated each of the best-interests factors enumerated under MCL 722.23, which broadly favored plaintiff, and it further determined the parties generally appeared unable to cooperate and agree on critical welfare decisions concerning SG and VG. With regard to MCL 722.23(a), which considers the love, affection, and other emotional ties existing between the parents and the minor children, the court noted plaintiff's continued care for SG and VG, which included the "heavy lifting" regarding parenting. While defendant testified he consistently participated in the minor children's lives, which included overseeing their day-to-day care and attending SG's and VG's extracurricular activities, plaintiff asserted she was solely responsible for the care of the minor children throughout her marriage to defendant, and defendant did not contribute to feeding, bathing, or the bedtime routine of SG and VG. See *Berger v Berger*, 277 Mich App 700, 705; 747 NW2d 336 (2008) (stating, "This Court will defer to the trial court's credibility determinations, and the trial court has discretion to accord differing weight to the best-interest factors"). Furthermore, defendant only set aside time for lunch on Sundays to spend with the children.

Addressing MCL 722.23(b), capacity and disposition to give children love, affection, guidance, etc., the trial court determined this factor favored plaintiff because she frequently provided for the children's needs while defendant solely wished to provide for his son, VG, and expressed concerns that his daughter, SG, was being guided towards being a "free woman." Plaintiff testified that she believed defendant posed a risk to SG and VG due to his unstable mental health and paranoia. Plaintiff further expressed defendant's discriminatory remarks, which ranged from inappropriate comments regarding various religions to race, would negatively impact SG and VG, and plaintiff did not want the children to believe his delusions. While plaintiff testified that she does not believe defendant would physically harm the children, she did not believe defendant was capable of overseeing the care of SG and VG without supervision, due to his inexperience with parenting the minor children.

Concerning MCL 722.23(c), the parties' capacity and disposition to provide the children food, clothing, etc., the court determined this factor favored plaintiff because she was able to provide for SG's and VG's needs with support from her family, while defendant, who was employed, refused certain dental care for SG. Plaintiff testified that she received financial support from her family, in addition to the $500 interim child support payments, to adequately provide SG and VG with any necessities. Plaintiff also planned on acquiring her own residence with the children after obtaining employment, and plaintiff observed a positive shift in SG's and VG's attitudes after leaving defendant.

The trial court further opined that MCL 722.23(d), concerning the length of time the children have lived in stable, satisfactory environment, favored plaintiff because the minor children resided with plaintiff at their maternal grandmother's house since April 2022, and defendant failed to interact or communicate with SG and VG since June 2022. Plaintiff stated she provided the children with a regular daily routine, which included making breakfast with SG and VG, dropping SG off at school with VG in the car, returning home with VG for playtime and naptime, and taking SG to dance once per week. Defendant had not attempted to see the children since June 2022.

The court additionally determined that MCL 722.23(e), permanence of existing or proposed custodial homes, favored plaintiff as she remained the children's primary caregiver, with no plans to change her immediate relationship status. Plaintiff testified that she did not plan on pursuing a romantic relationship in the near future, however, defendant informed plaintiff he was currently in a relationship.

As to MCL 722.23(f), the moral fitness of the parties, the trial court found this also favored plaintiff due to defendant's history of domestic violence, racist and inappropriate emails to plaintiff's counsel, and 2017 misdemeanor for "slapping" plaintiff. There was additionally extensive testimony during the bench-trial proceedings regarding defendant's inappropriate conduct throughout his marriage and the divorce proceedings. Defendant admitted that between June 3, 2022, and March 20, 2023, defendant sent over 500 emails to plaintiff's counsel, which were disrespectful in nature and included statements such as, "I love you, I'd like to marry you, I'd like to [f**k] you." Defendant further testified, regarding the text message exchanges between himself and plaintiff, that he sent messages to plaintiff stating, "I know you're not worth it," and, "It could have always done different. To shoot you, it's not that I can't do it," which defendant denied was a threat because he never intended to shoot plaintiff, but attributed it to airing his frustrations regarding the divorce.

With regard to MCL 722.23(g), the parties' health, the trial court determined this factor favored plaintiff because defendant physically and emotionally abused plaintiff, and defendant believed various conspiracies regarding his military involvement, the surveillant nature of technology, and being of a "chosen" nature. While defendant advances the testimony of Dr. Stephanie Pyrros-Hensen demonstrated he did not suffer from any mental health issues, Dr. Pyrros-Hensen asserted it was in the minor children's best interests to proceed with supervised parenting time with defendant due to his past concerning conduct. Moreover, plaintiff detailed defendant's paranoia; defendant would assert "the neighbor's dogs are listening to us" or "some kind of radiation in the air that's causing us to act certain ways[,]" and defendant filed a complaint with the West Bloomfield Police Department in 2020 alleging persons were pursuing him. Defendant destroyed property on numerous occasions, which included the family's television and his personal cellphone, under the belief these items were surveillance devices. Furthermore, defendant expressed his views regarding various conspiracy theories in his closing argument, and defendant expressed, "since [SG] was born, we haven't seen a good day."

The trial court additionally concluded MCL 722.23(h), the children's home, community, and school record, favored plaintiff as SG and VG resided in Macomb County with plaintiff, where SG attended elementary school and thrived. Plaintiff testified that SG was excelling in school and participating in a number of extracurricular activities, and the majority of SG's friends also resided in Macomb County.

The court noted it was unable to evaluate MCL 722.23(i), the reasonable preference of the children, because SG and VG were not interviewed. The trial court determined MCL 722.23(j), the parties' willingness and ability to facilitate and encourage a continuing relationship between the children and other parent, favored plaintiff because she expressed concerns regarding SG's and VG's wellbeing under defendant's care, while defendant failed to interact with his children since June 2022. Defendant additionally testified that it was in the children's best interests for defendant to have full custody of VG, while plaintiff should have full custody of SG, as opposed to having the minor children reside together. Defendant asserted he would reserve time for the siblings to spend together.

The court also found MCL 722.23(k), domestic violence, favored plaintiff due to defendant's conduct as a perpetrator of physical and emotional violence towards plaintiff. Plaintiff detailed that the domestic violence incident, which led to plaintiff filing for divorce, occurred at approximately 1:00 a.m. or 2:00 a.m. in a hotel room while the family was on a trip to Traverse City, Michigan. VG accidently fell off the bed, defendant proceeded to yell and blame SG, in addition to throwing a pillow at plaintiff, which caused the minor children to cry. Plaintiff further testified there were previous altercations, including one event in May 2017, during which, "[defendant] was very aggressive. I was holding our daughter in my hand. I was on the stairs, he punched me and he got very aggressive and then my face was all black and blue and then I just waited for him to leave and then I finally called my family to leave and make a report." Plaintiff further shared she received a number of threatening text messages from defendant, in addition to concerning physical conduct during the last visitation with defendant, SG, and VG; defendant attempted to force open plaintiff's car door, and defendant informed plaintiff, "he was gonna put two in my head and did the gun like symbol." Plaintiff expressed she continued to feel threatened and uncomfortable around defendant following this interaction.

The trial court opined, regarding the parties' potential to cooperate and generally agree concerning important decisions affecting the welfare of SG and VG, that the high degree of animosity between plaintiff and defendant would prohibit the effective communication required for joint legal custody. See *Wright v Wright*, 279 Mich App 291, 299; 761 NW2d 443 (2008) (providing when "the record reflects a deep-seated animosity between the parties and an irreconcilable divergence in their opinions about how to foster each child's well-being," joint legal custody is "not an option"). Plaintiff additionally testified that she did not believe she would be able to maintain a healthy coparenting relationship with defendant because of his repeated inability to acknowledge plaintiff's parenting opinions. Because the trial court properly addressed each best-interest factor, which included mention of the parties' inability to coparent, and explicitly connected these findings to its custody determination, it did not commit clear legal error.

While defendant claims the trial court's custody determination was contrary to the Friend of the Court recommendation, the Friend of the Court endorsed awarding plaintiff sole legal and physical custody of SG and VG. The record demonstrates the court appropriately concluded, by clear and convincing evidence, that it was not in the minor children's best interests to change the established custodial environment with plaintiff, and it awarded plaintiff sole legal and physical custody of SG and VG in accordance with the great weight of the evidence. Therefore, defendant has failed to demonstrate that he is entitled to relief.

Affirmed.

/s/ Kathleen Jansen
/s/ Mark J. Cavanagh
/s/ Michael F. Gadola